**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-2406

JOHN MCGUINNESS; DIANE ELLER; JESS V. CLAMPITT, JR.; RONNIE
CLAMPITT; EARLENE VON DER OSTEN; STEPHEN ZUCKER; NANCY
MOSTELLER; JOHN MAKAR; AURELIA STONE,

Plaintiffs – Appellants,

and

ROBERT VON DER OSTEN,

Plaintiff,

v.

UNITED STATES FOREST SERVICE,

Defendant – Appellee.

Appeal from the United States District Court for the Western District of North Carolina,
at Asheville. Max O. Cogburn, Jr., District Judge. (1:15-cv-00072-MOC-DLH)

Argued: May 10, 2018                                    Decided: July 26, 2018

Before TRAXLER and DIAZ, Circuit Judges, and Richard M. GERGEL, United States
District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Perrin Wells de Jong, PERRIN DE JONG, ATTORNEY AT LAW, Asheville, North Carolina, for Appellants. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, Portland, Oregon, for Appellants. Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following approximately 11 years of environmental study and public comment, the United States Forest Service authorized the development of three to five acres of the Nantahala National Forest in Clay County, North Carolina, for a shooting range. Appellants are individual residents of Clay County who opposed this project and brought an action challenging the Forest Service's actions under the National Environmental Policy Act ("NEPA"), *see* 42 U.S.C. § 4321 *et seq*., and seeking declaratory and injunctive relief. The district court granted the Forest Service's motion for summary judgment and dismissed the action. Because the Forest Service's decision to approve the shooting range was not arbitrary or capricious, we affirm.

I.

In late 2001, Tusquittee District Ranger Charles Miller of the Forest Service began gauging local interest in the construction of a shooting range in an area of the Nantahala National Forest located in Clay County, North Carolina. In January 2002, a group of Clay County residents formed the Clay County Sports Club ("CCSC") for the purpose of building, operating and maintaining a recreational shooting range on property situated in the Nantahala National Forest.

In September 2002, the Forest Service solicited public input on a proposed shooting range project to be located in Clay County near Birch Cove off Nelson Ridge Road in the Nantahala Forest. Public reaction from local individual residents, interest groups and governing bodies was extensive and mixed. The North Carolina Wildlife Resources Commission, for example, supported the project, which it believed would

3

"benefit the public and environment by providing a controlled shooting environment." J.A. 60. Numerous individual Clay County residents expressed their support for the proposed Nelson Road project, as it afforded local enthusiasts an alternative to the closest existing shooting range, which was situated in Georgia, and the availability of private land for construction of a shooting range was "diminishing." J.A. 61. Other local residents expressed opposition—either to the general idea of a shooting range or to the proposed location—due to numerous concerns, including "target range noise," "impact . . . [on] property values," traffic and "closeness to population." J.A. 71.

In May 2005, having taken note of the concerns raised by the public, the Forest Service proposed three alternative sites for the shooting range, including one in the Chestnut Branch area. In seeking public comment on this proposal, the Forest Service indicated that it would prepare an Environmental Assessment ("EA") to consider the environmental effects of a shooting range at each of the four sites, including "such factors as public safety, potential noise from gunfire, heritage resource sites, and threatened or endangered plant and animal species." J.A. 106. Once again, public reaction was mixed. Notably, even some of those expressing opposition recognized the need for "a safe shooting area as [the] county population grows," J.A. 115, and simply objected to one of the proposed locations.

In October 2007, the Forest Service asked for public comment on one final potential location for the shooting range near upper Perry Creek, approximately 1,000 feet below and 2,500 feet west of Clay County's most popular trail for hiking and horseback riding, the Chunky Gal Trail. As before, reaction was mixed. Both those in

4

favor and those opposed acknowledged a safe area to shoot was "badly needed." J.A. 124. However, a number of opponents, in addition to raising continued concerns about noise and traffic, asserted that there were shooting ranges available that eliminated the need for one in Clay County.

In April 2008, the Forest Service, in conjunction with other agencies, conducted a noise impact test ("2008 sound test") at the Perry Creek site because public comments had identified noise as a substantial concern with regard to that location. The test was conducted on a "clear, still day" in order "to maximize the potential for sound to carry as far as possible." J.A. 535. The Forest Service placed a marksman at the proposed site and instructed him to "fire a total of ten shots with two firearms . . . considered [to be] among the loudest of the commercially available firearms likely to be encountered at a Forest Service shooting range." *Id.* Members of the test team were situated on "nearby parcels of private land." *Id.* Only the person located closest to the proposed site was able to hear any of the test shots, and even then, he could only "hear a very faint report from some, but not all, of the test shots." *Id.*

In October 2008, the Forest Service and the CCSC entered into an agreement whereby the CCSC agreed "to assist with the cost of review and comment" for, among other things, "the Environmental Assessment for the Clay County Shooting Range proposal." J.A. 300. The site had not been predetermined at this time; however, the Forest Service had narrowed the possibilities to two locations—Perry Creek and Chestnut Branch.

5

In May 2010, the Forest Service issued an extensive EA for the Clay County shooting range project and published notice in the local newspapers formally inviting public review and comment. As before, the Forest Service received mixed input from the public. Many of the supporters preferred the Perry Creek site because it was further than Chestnut Branch from residential areas and it was oriented such that users would fire toward the side of a mountain instead of a ridge, making it safer.

Shortly after issuing the 2010 EA, the Forest Service retained Dr. Paul Schomer of the Acoustical Society of America to perform a sound assessment of the noise reaching private property near both of the proposed sites. Schomer was also asked to estimate the noise level that would be created along the sections of the Chunky Gal Trail running by both sites. Schomer was informed that no matter which site was selected, the shooting range would be covered by a roof and no large-caliber rounds, shotguns or automatic weapons would be allowed. Schomer performed his assessment using a "worst case hour" scenario simulating heavy use and determined that "[t]he Chunky Gal Trail will experience clearly noticeable, possibly bothersome gunfire noise from either of the proposed ranges." J.A. 630. Schomer recommended the Perry Creek location, however, "because the gunfire noise on Chunky Gal trail will drop off quickly as one moves in either direction away from the point of closest approach of the Chunky Gal trail to the Perry Creek site." *Id.* Additionally, Schomer found that "no private residences are impacted" by shooting at the Perry Creek location. *Id.*

In October 2010, the Forest Service issued a Decision Notice approving the Perry Creek location for construction of a firing range. After District Ranger Steve Lohr met

6

with a group of community members (including Appellants) who had objected to the Decision Notice, the Forest Service withdrew the notice in order to include "additional analysis on the topics of traffic, dust, and noise." J.A. 482.

In March 2012, the Department of Forestry & Geology at the University of the South submitted a report to the Forest Service regarding the dust that would be produced as a result of increased traffic on Nelson Ridge Road by users of the Perry Creek site. According to the report, "any proposed increase in traffic . . . will not raise the 24 hour average . . . above the federal standard," provided "the total number of cars remains below 500 and their average speed remains less than 55 mph." J.A. 660.

Also in March 2012, the Forest Service conducted another sound test ("2012 sound test") at the Perry Creek site in response to complaints about the adequacy or accuracy of the 2008 sound test. During the second test, local residents, Forest Service employees, and CCSC members were positioned at seven private property locations selected by the residents to record any audible gunfire during the test. The Forest Service attempted "[t]o simulate the heaviest possible use" by having eight people shoot pistols and rifles during three one-minute periods, producing a "rate of fire . . . between 60 to 80 rounds per minute." J.A. 537. At four of the locations, no sounds were detected. Listeners at two of the locations reported hearing gunfire during one of the three live-fire periods. And, at the other spot, listeners reported hearing gunfire during all three of the live-fire periods, but described the noise level as "louder than low conversational speech" but "not louder than normal conversational speech." *Id.* Finally, during this same test,

7

volunteers were placed on the Chunky Gal Trail near the Perry Creek site and reported hearing gunfire that was "almost as loud as shouting." J.A. 539.

In August 2012, the Forest Service issued a revised EA for the Clay County firing range project and requested public comments. As in each previous instance, the Forest Service received public input both generally in support and in opposition to the proposed construction of a firing range. Supporters and opponents offered a few additional considerations as well. The Clay County Board of Commissioners submitted another letter in support of the project, but expressed a preference for the Perry Creek site because it afforded law enforcement officers a safe and convenient location to "certify/re-certify with their firearms," J.A. 451, as well as a safe location for Clay County school shooting teams to practice and compete. On the other hand, a local realtor's objection to the project was based in part on her anticipated obligation "to disclose the possibility of gun fire reports to every client looking to buy in the Tusquittee Valley," which would "depreciate the land values." J.A. 456. Finally, the Forest Service received a report from Merck & Hill Consultants critiquing the 2012 sound test which had been included in the revised EA. The Merck report noted that the test did not sufficiently account for meteorological data or topography or consider that "the psychological and physiological responses to gunfire sounds may cause greater stress than exposure to vocal sounds" and would therefore "likely be more bothersome" than vocal sounds at the same level. J.A. 1054. The Merck report concluded that "more thorough evaluations over a longer period of time and under differing seasonal and meteorological conditions" were needed to meaningfully assess the sound impact of a firing range. J.A. 1054-55.

In June 2013, the Forest Service issued a second revised EA. In reiterating the need for the construction of a shooting range, the second revised EA noted that, because there is no suitable and convenient firing range in or near Clay County, "local residents frequently use privately owned lands in Clay County for target practice," potentially creating "unsafe conditions." J.A. 478. In light of the dramatic population growth in Clay County and the "corresponding residential development," the second revised EA stated that "a safe, convenient public range could reduce dispersed shooting activity in the county, improve public safety, and reduce the negative impacts of dispersed shooting to physical, biological and social resources." *Id.*

The second revised EA identified the key issues developed through the public comment process, which included: (1) whether "the proposed shooting range at Perry Creek would produce a constant or continuous sound of gunshot" and cause a "persistent impact to residents in the Upper Tusquittee Valley," J.A. 482; (2) whether "the sound of gunfire from the range would impact the solitude that is sought by Chunky Gal trail hikers," *id.*; (3) whether, if the Perry Creek site were to be selected, "the increase in traffic on Nelson Ridge Road would exceed the capacity of the road to safely handle the number of cars using it," *id.*; and (4) whether, were the Perry Creek location selected, "the increase in traffic on Nelson Ridge Road would generate airborne dust levels . . . that exceed [EPA] standards," J.A. 482-83. The second revised EA highlighted these issues throughout the report as it addressed the consequences of locating a firing range at either the Perry Creek or the Chestnut Branch sites on natural resources (including impact on soils, water quality, air quality, cultural resources, and inventoried roadless areas); on

9

biological resources (including threatened or endangered species, special habitats, and wildlife); and on the human environment (including noise, recreational resources, scenery effects, vehicular traffic and health and safety).

The second revised EA noted that "[s]ound management is an important consideration at both of the proposed sites" and that several things could be done to reduce noise, including imposing "[r]estrictions on the number of users as well as the type, size, and caliber of firearms"; orienting firing lines "to direct shooting away from soundsensitive areas"; incorporating engineering features such as "[b]erms and non-porous walls [that could] serve to deflect and absorb sound"; and adding new or relying on existing vegetation, such as evergreens which "retain sound-absorbing foliage year-round." J.A. 488. The second revised EA then summarized at length the three sound tests the Forest Service had conducted. With respect to the Perry Creek site, the second revised EA indicated that "[t]he project would produce marginal direct" and "few indirect effects to local residents due to noise," but that "[h]ikers on segments of the Chunky Gal Trail . . . would experience direct impacts from gunfire noise" that "would approximate the sound of very loud conversational speech (almost as loud as shouting) during infrequent periods of very heavy use." J.A. 539. The second revised EA estimated "that between two and three miles of the Chunky Gal trail may experience sounds from the shooting range," which constituted approximated about "9.5% to 14.3% of the total trail miles under this proposal." *Id.* As for the *overall* effect of the noise created by the proposed shooting range at Perry Creek, the Forest Service stated that the gunfire would add to a variety of existing "human-induced sounds in the area, including vehicular

10

traffic, domesticated animals, small engine sources (e.g. tractors, lawn mowers, leaf blowers, tillers, string-trimmers), and overflying aircraft." *Id.*

With regard to traffic, both proposed range sites would be "accessed by single lane gravel roads," and "traffic safety, both to those using the roads, and in the case of the proposed Perry Creek site, to residents who use Nelson Ridge Road to access their property," was an important issue. J.A. 546. To assess traffic that would be generated by a Perry Creek shooting range, the Forest Service installed two traffic counters in 2011 and determined "that daily use of Nelson Ridge Road would increase between six and eight vehicles per day." J.A. 549. The Forest Service concluded that, "[b]ased on the current and projected traffic figures, . . . Nelson Ridge Road can safely absorb range-related vehicular use in addition to current use." *Id.*

Finally, the second revised EA indicated that "the Forest Service partnered with a nearby university to conduct independent research into airborne dust." J.A. 552. It found that dust would not pose a significant problem:

> Airborne road dust would be generated from gravel roads and parking areas from vehicles accessing the range. While road dust is a nuisance, independent research conducted for this project on airborne dust indicates that the fine particulates would not be a human health issue given the projected vehicular traffic loads and driving speeds.

J.A. 493.

In June 2013, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("FONSI"), dated June 3, 2013, which approved of and authorized the construction of a shooting range at the Perry Creek site. The Forest Service subsequently withdrew this Decision Notice, citing "a procedural error regarding publication of the

11

legal notices." J.A. 738. In September 2013, the Forest Service issued its fourth and final revised EA ("September 2013 EA"), which was essentially identical to the previous EA but included a more thorough analysis and explanation of the "No Action" alternative in each analytical section. J.A. 754. And, on September 27, 2013, District Ranger Lauren Stull issued a final Decision Notice and FONSI, authorizing the construction of a shooting range at the Perry Creek site. Ranger Stull explained that, "[b]ased upon [her] review of the alternatives, [she] decided to select . . . [the] Perry Creek Location of the Clay County Shooting Range Project Environmental Assessment (EA)" to "develop approximately three to five acres off Passmore Spur Road near Perry Creek as a recreational shooting range." J.A. 942. The Decision Notice explained that "[t]he purpose for the proposal . . . is to provide a safe and environmentally sound and secure public shooting facility to serve the local community of Clay County, North Carolina," and "to address the lack of a facility that is designed to minimize the impacts to physical, biological and social resources." J.A. 943.

In explaining why she selected the Perry Creek alternative over the No Action alternative, Ranger Stull stated in pertinent part as follows:

> Under [the "No Action"] Alternative . . . , the Forest Service would not establish a shooting range in Clay County and . . . there would be no designated facility . . . to provide the public with the opportunity for recreational shooting. I did not select this alternative because it would not have met the purpose and need to provide a safe and environmentally sound and secure public shooting facility designed to contain lead and noise as described in . . . the [September 2013] EA.

J.A. 944.

12

As for why she selected the Perry Creek alternative over the Chestnut Branch alternative, Ranger Stull stated:

● Unlike the Perry Creek location . . . , the topography at the Chestnut Branch location does not provide a supplemental natural back stop, increasing the potential for bullets to leave the range site [as it] is positioned at an elevation of approximately 4000 feet and is located on top of a natural topographic shelf which does not provide an adequate natural back stop behind the proposed range. . . .
● The sound test conducted by Schomer and Associates in 2010 . . . showed that noise from the range would impact residences in the Rainbow Springs area.
● The facility at [Chestnut Branch] would have offered four to five shooting lanes, fewer than could be established [at Perry Creek].

*Id.*

By contrast, the Perry Creek location more adequately addressed the key issues according to Ranger Stull:

● [The Perry Creek location] is positioned at approximately 2,800 feet in elevation and the existing topography allows for a natural backstop beyond any constructed backstops with an increase in elevation of 1,000 feet above the range site. This natural backstop surrounds the proposed shooting direction and covers approximately 180 degrees which encompasses the trajectory safety zone.
● Results from three sound tests . . . show minimal nuisance noise from the Perry Creek location, even in the absence of sound management features [that] . . . [t]he Forest Service will implement[, including] a combination of operational, site, engineering, and vegetation approaches to manage noise from the facility.
● Results from traffic studies for [Perry Creek] show that current and projected range use is consistent with [applicable standards] for the roads that access the range site. The Forest Service will implement traffic calming measures as a safety precaution for residents along Nelson Ridge Road and forest users.
● Results from a dust analysis for [Perry Creek] shows that the projected use will not generate hazardous amounts of fine particulates in road dust from vehicles accessing and exiting the range site.

J.A. 943.

13

Ranger Stull formally determined that the project "will not have a significant effect on the quality of the human environment considering the context and intensity of Impacts," J.A. 944, precluding the need for an environmental impact statement ("EIS").

Appellants filed an administrative appeal, arguing that (1) the EA did not consider "[a]n [a]dequate [r]ange [o]f [a]lternatives," J.A. 1066; (2) the study of noise "[i]mpacts [t]o the Chunky Gal Trail" was flawed, J.A. 1068; (3) the effects of the project on the Chunky Gal Trail had not been adequately considered; (4) the study of "[t]raffic [i]mpacts [t]o Nelson Ridge Road" was insufficient, J.A. 1069; and (5) the description of the implementation of the project was insufficient. The Appeal Reviewing Officer issued a written decision rejecting each of these contentions and affirming the approval of the Clay County shooting range project.

II.

Appellants filed this action for declaratory and injunctive relief, seeking a declaration that the Forest Service, in issuing the Decision Notice, FONSI and September 2013 EA, acted in a manner that was arbitrary and capricious, and a judgment vacating the decision authorizing the shooting range. Appellants alleged specifically that the Forest Service violated NEPA by failing to "rigorously explore and objectively evaluate the full range of reasonable alternatives, including the no action alternative, before issuing the Decision Notice," J.A. 1150; that the Forest Service violated NEPA by failing to prepare an EIS; and that the Forest Service violated NEPA by failing to prepare a Decision Notice, a FONSI or an EA that conformed with NEPA. Appellants also alleged

14

that the Decision Notice and FONSI violated North Carolina state law; however, Appellants do not challenge the dismissal of this claim on appeal.

The parties filed cross motions for summary judgment. The district court granted the Forest Service's motion, concluding that, as a matter of law, the agency's "'hard look'" at "the potential environmental impact of the project" passed muster under the arbitrary and capricious standard. J.A. 1367. Additionally, the district court rejected Appellants' argument that an EIS was required, explaining that "[i]nasmuch as the administrative decision to issue an EA rather than an [EIS] was based on extensive scientific studies, the decision was not arbitrary and capricious . . . as the agency provided an explanation of its decision that included a rational connection between the facts found through those studies and the choice it ultimately made." J.A. 1369. The district court rejected the Appellants' contention "that the premise of the project was faulty as there was no need to build the shooting range inasmuch as a private shooting range existed in an adjoining county in the State of Georgia" and therefore led the Forest Service to improperly reject the "'no-build'" alternative "out-of-hand." J.A. 1369-70. In addressing this argument, the district court noted that public comment demonstrated that "even if a private range was available in an adjoining county, residents were not using it, opting instead to discharge firearms on private and public lands" and that "shooting in uncontrolled settings increased the likelihood of accidents and raised the risk to others." J.A. 1370.

Finally, the district court found Appellants' critique of the agency's analysis of the potential effect of the project on noise level, traffic, dust and property values to be

15

unconvincing. With respect to noise, the court observed that the agency's evaluation, which included "several sound tests," constituted a "'hard look' at the data before it." J.A. 1371. As for the traffic, the district court noted that the Forest Service conducted two studies upon which it reasonably reached the conclusion that planned "traffic calming measures" would be sufficient to address increased traffic. J.A. 1372. The district court noted, moreover, that the Forest Service "conducted a dust analysis using the atmospheric dispersion modeling system" and determined "that the projected increased traffic caused by the shooting range would not generate enough dust to exceed" standards established by the EPA. *Id.* The district court was "satisfied" that this constituted a "hard look" at the evidence regarding dust. And, as for the agency's failure to consider the effect of the project on local property values, the district court concluded that "[p]roperty values are not an environmental impact, but instead an economic consequence," and thus the agency had not acted in an arbitrary and capricious manner in this respect. J.A. 1374.

## III.

## A.

"NEPA sets forth a regulatory scheme for major federal actions that may significantly affect the natural environment." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). "NEPA is a procedural statute; it does not force an agency to reach substantive, environment-friendly outcomes. Rather, NEPA simply requires that the agency take a 'hard look' at environmental impacts before taking major actions." *Id.*; *see Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)

16

("Under NEPA, federal agencies must take a 'hard look' at the potential environmental consequences of their actions."). And, because NEPA is procedural in nature, "even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Aracoma Coal Co.*, 556 F.3d at 191. "NEPA merely prohibits uninformed—rather than unwise—agency action." *Nat'l Audubon Soc'y*, 422 F.3d at 184 (internal quotation marks omitted). Additionally, NEPA requires an agency "to disseminate information that allows the public to participate in the decisionmaking process." *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196 (4th Cir. 2012)

We review claims asserting that an agency violated NEPA under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 701 *et seq.*; *Capka*, 669 F.3d at 196. Pursuant to the APA, "a court will set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ohio Valley Envtl. Coal., Inc. v. United States Army Corps of Eng'rs*, 828 F.3d 316, 321 (4th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)). "In determining whether agency action was arbitrary or capricious, [a] court examining the sufficiency of an agency's environmental analysis under NEPA must determine whether the agency has taken a 'hard look' at an action's environmental impacts." *Nat'l Audubon Soc'y*, 422 F.3d at 185.

"Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid," particularly "in matters involving not just simple findings of fact but complex predictions based on special expertise." *Aracoma Coal Co.*, 556 F.3d at 192. While deferential review in this context "does not turn judicial review

17

into a rubber stamp," neither does it permit judicial "second-guessing" of "substantive decisions committed to the discretion of the agency." *Nat'l Audubon Soc'y*, 422 F.3d at 185. Here, judicial review serves "primarily to educate the court so that it can understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made." *Aracoma Coal Co.*, 556 F.3d at 192-93 (internal quotation marks omitted). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Id.* at 192 (internal quotation marks omitted). At bottom, "[i]n determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.*

## B.

First, Appellants contend that the Forest Service violated NEPA by failing to adequately compare the environmental effects of the No Action alternative with the environmental effects of authorizing a shooting range at one of the proposed sites. Appellants' primary focus is on the noise effects of the project. In particular, Appellants assert that the September 2013 EA lacks meaningful data with regard to the "quiet conditions" that would exist near the proposed alternative sites if "no action were taken." Brief of Appellants at 33. Lacking information about existing conditions in the absence of the proposed project, Appellants argue, the Forest Service and the public were deprived of a meaningful basis for determining the environmental impacts of gunfire

18

from the proposed shooting range sites, rendering the Forest Service's decision to build the Perry Creek shooting range arbitrary and capricious. We disagree.

NEPA requires that an agency considering a proposed action "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(E). Under NEPA's implementing regulations, the agency must consider a "no action" or "'no build' alternative" *when issuing an EIS*. *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 602, 603 (4th Cir. 2012); *see* 40 C.F.R. § 1502.14(d). The Forest Service did not prepare an EIS in this case, concluding that its 175-page September 2013 EA was sufficient to assess the environmental effects of the project. Unlike an EIS, an EA is intended to be "a concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [("FONSI")]." 40 C.F.R. § 1508.9(a)(1). Under the regulation *applicable to EAs*, there is no explicit directive that the agency consider a "no action" alternative; an EA must simply include "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

The September 2013 EA discusses at every step of its analysis, in a fairly detailed manner, the need for the proposed shooting range and the environmental impacts of the alternatives to the proposed shooting range, including the no build alternative. Most significantly, the September 2013 EA describes *existing* noise levels in the vicinity of the proposed shooting range sites, and provides a detailed description of the additional noise

19

that would result from either of the proposed alternatives. With respect to existing noise levels, the September 2013 EA states that "[c]urrent noise levels in the proposed treatment areas," in the absence of a shooting range, "are generated primarily by natural sources, and include (but are not limited to) wind, flowing water, birds, insects (e.g. cicadas, katydids), and thunder." J.A. 805. The September 2013 EA further notes:

> These ambient sounds vary in duration and intensity throughout the day, ranging from noise equivalent to a whisper (gentle breezes) to louder than yelling (nearby thunder). Natural ambient sounds in the treatment area also have a seasonal component, with winter conditions resulting in the lowest noise levels and spring and summer producing the most. While a subjective assessment, for the purposes of this EA the sound levels at the proposed treatment areas will be classified as being of predominantly low intensity.

*Id.*

The Forest Service also included a table in the September 2013 EA summarizing the results of the 2012 sound test, which described existing background ambient sounds near the Perry Creek location such as wind chimes, wind in trees, roosters, traffic and barking dogs. These noise levels ranged from "[l]ouder than a whisper" to "[l]ouder than normal conversational speech." J.A. 808. Finally, the September 2013 EA also discussed the "[c]umulative impacts to local residents from noise" at the alternative proposed sites, including all existing "human-induced sounds." J.A. 809. At Perry Creek, the existing sounds included "vehicular traffic, domesticated animals, small engine sources (e.g. tractors, lawn mowers, leaf blowers, tillers, string-trimmers), and overflying aircraft." *Id.*

20

With this baseline description of existing ambient noise, the Forest Service explained in detail, as previously described, the live-fire sound tests that were conducted, and the Forest Service considered the impact of the two action alternatives on existing noise levels. At the Perry Creek site, "[h]ikers on segments of the Chunky Gal Trail . . . would experience direct impacts from gunfire noise, with the greatest impacts at the trail's closest approach to the proposed facility," at levels approximating "the sound of nearby normal conversations" during heavy use of the shooting range and "the sound of very loud conversational speech (almost as loud as shouting) during infrequent periods of very heavy use." J.A. 809. The September 2013 EA concluded, finally, that "[b]ecause noise levels in the area are currently low, the cumulative impact to forest visitors in the area would be the noise emanating from the shooting range. To diminish these effects, the Forest Service would implement management actions to contain and reduce noise emanating from the shooting range as needed." J.A. 809-10.

The Forest Service's consideration of the alternatives, including the No Action alternative, was more than sufficient to satisfy the NEPA requirement that it "take a 'hard look'" at the effect of its actions on the existing noise level. *Aracoma Coal Co.*, 556 F.3d at 191. In considering the impact of the proposed alternatives on soils, water quality, air quality, cultural and historical resources, roadless areas, biological resources, and the human environment, the September 2013 EA addressed, in varying degrees of detail, the No Action alternative. We conclude that the Forest Service took the requisite "hard look at the potential environmental consequences of" its decision authorizing the proposed shooting range. *Id.*

21

C.

Appellants next argue that the Forest Service violated NEPA by not issuing an EIS. NEPA requires that federal agencies prepare an EIS only for "major Federal actions significantly affecting the quality of the human environment." *Id.* (quoting 42 U.S.C. § 4332(C)). "Significance," in turn, "is determined by evaluating both the context of the action and the *intensity*, or severity, of the impact." *Id.* (emphasis added); *see* 40 C.F.R. § 1508.27. Among the considerations for evaluating intensity of the impact is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). When "it is not readily discernible how significant the environmental effects of a proposed action will be, federal agencies may prepare an [EA]." *Aracoma Coal Co.*, 556 F.3d at 191; *see* 40 C.F.R. § 1501.4(b), (c). One of the purposes of the more summary EA is to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a)(1).

Appellants argue that an EIS was required because the Forest Service's finding that gunfire on the human environment near the proposed Perry Creek shooting range would have no significant impact is "highly controversial." 40 C.F.R. § 1508.27(b)(4). Appellants base their position on several claims. First, Appellants suggest that the September 2013 EA fails to acknowledge the "startling effect" that gunshots can have on human beings. Brief of Appellants at 14 (internal quotation marks omitted). Second, Appellants dispute the Forest Service's conclusion that the three sound tests show minimal nuisance noise from the Perry Creek site for several reasons: that the 2008 and

22

2010 sound tests "had to be re-run due to public objections," Brief of Appellants at 37; that only the 2010 sound test was conducted by sound experts who in fact found that users of the Chunky Gal Trail would experience potentially bothersome gunfire noise from the Perry Creek site; that none of the tests measured the actual decibel levels of the existing ambient sounds; that sound expert Merck disputed that the noise levels produced by gunfire from the Perry Creek site were linked to the rate of fire; and that Merck opined that a shooting range in the proposed locations might significantly degrade the existing, natural auditory conditions. Appellants contend that the Forest Service's FONSI runs counter to the foregoing evidence, reflecting that a substantial dispute existed and that the Forest Service was required to prepare an EIS to comprehensively address those auditory effects.

We disagree. It is apparent from both the September 2013 EA and the Decision Notice that the Forest Service did not act arbitrarily or capriciously in selecting the Perry Creek alternative without first issuing an EIS. The agency carefully considered the noise effects of its decision, noting that the shooting range would create additional low-level noise for residents in the vicinity and that hikers on the Chunky Gal Trail would hear gunfire and increased noise levels that would approximate loud conversational speech or even shouting during very heavy shooting range use. In the Decision Notice, Ranger Stull then specifically considered the regulatory factors for determining whether an EIS was required. In particular, she found that "[t]he effects on the quality of the human environment are not likely to be highly controversial" and that "the effects are not

23

uncertain, and do not involve unique or unknown risk," as "[t]he Forest Service has considerable experience with the types of activities to be implemented." J.A. 945.

These are reasonable conclusions based on agency expertise to which we defer. In this context, agency action is "likely to be highly controversial" when "a substantial dispute exists as to the size, nature or effect of the major federal action." *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973) (internal quotation marks omitted). The general effects of gunfire on the environment are clearly not uncertain or unknown. The sound of a rifle being discharged is well-known to anyone in the Forest Service. And, assuming the proposed project qualifies as a "major federal action," there is no "substantial dispute" regarding "the size, nature or effect" of the proposed project. Appellants nitpick the results of the sound tests considered by the Forest Service, but mere opposition—or the extent of that opposition—to a proposed agency action does not create a "substantial dispute" or make the action "highly controversial." *See id.* ("We reject . . . the suggestion that 'controversial' must necessarily be equated with opposition.").

The only dispute as to the effect of the gunfire that will occur at the proposed shooting range is fairly minor. The Forest Service hired an expert to conduct a sound test; Appellants contend that Merck's expert analysis created a substantial dispute about the noise that will emanate from the project. This is simply not so. Merck did not conduct its own sound test of the proposed shooting range but simply critiqued the Forest Service's tests and suggested that gunfire sounds "may cause greater stress than exposure to vocal sounds" and would "likely be more bothersome or annoying for the same given sound level." J.A. 1054. It is certainly reasonable and not arbitrary or capricious to

24

conclude that such speculative statements create no significant dispute or controversy—scientific or otherwise—over the effects of the actual noise levels created by the project.[*]

Finally, even if we concluded, based on the issues identified by the Appellants, that the proposed project is "likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4), "the existence of a controversy is only one of the ten factors listed for determining if an EIS is necessary." *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 184 (3d Cir. 2000). In view of the nature of the controversy—which Appellants have tried to create by questioning the methodology of the sound tests and other information considered by the agency—and "the fact that degree of controversy is only one of ten factors to be considered in determining whether a significant impact is present," *id.*, we conclude that the issuance of the FONSI and the Decision Notice in the absence of an EIS was not arbitrary or capricious.

D.

Appellants contend the Forest Service violated NEPA by not considering the possible effects of the proposed shooting range project on the values of nearby property. An EA must include "brief discussions . . . of the environmental impacts of the proposed

---

[*] We are likewise unconvinced by Appellants' other arguments suggesting that the proposed project is likely to be highly controversial. For example, the suggestion that the 2008 and 2010 sound tests had to be "re-run" because of public objections to their "accuracy" is refuted by the record. In response to continued concern about noise levels expressed by the public during the eleven-year study period, the Forest Service simply ran additional tests to obtain more information. It did not re-run the same tests as if they were flawed. As the Forest Service points out, "[t]his kind of agency decision making is precisely what NEPA encourages." Brief of Appellee at 58.

action and alternatives." 40 C.F.R. § 1508.9(b). Impacts in this context include effects that are "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, *economic*, social, or health." 40 C.F.R. § 1508.8(b) (emphasis added). Though authority is scant, some courts have considered the potential effect of a proposed agency action on nearby property values. *See Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324 (D.C. Cir. 2015) (considering whether "Environmental Assessment [took] a 'hard look' at 'quantifying the impacts of the project on property values and lost development opportunities'").

The September 2013 EA lists the value of private property near the proposed shooting range locations as one of several "other concerns" identified "through the public comment process." J.A. 751. It provides in full as follows:

> Concerns regarding the values of private property near the shooting range. This is not a key issue because it is not supported by scientific research. The Forest Service searched the literature and consulted with social scientists and legal experts and could not find scholarly research proving a direct and statistically significant link that shooting ranges devalue surrounding property.

J.A. 752.

According to Appellants, there was uncontradicted evidence before the Forest Service indicating that the presence of a shooting range creates a strong likelihood of diminished nearby property values. Such evidence included an anecdotal opinion from a local realtor that the Perry Creek range "undoubtedly would lessen the desirability of the area and would depreciate the land values in the Tusquittee Valley," J.A. 456, and

26

evidence that persistent noise—such as that created by air traffic or a speedway—tends to have a depressive effect on property values. Appellants also point to a law review article that was offered to the Forest Service and indicated that property owners commonly complain that shooting ranges hurt the value of their property. Because the September 2013 EA did not discuss any of these items specifically, Appellants contend that the Forest Service refused to take the required "hard look" at this information, rendering its decision arbitrary and capricious.

As is apparent from its statement in the September 2013 EA, the Forest Service did not simply refuse to consider the effect of a shooting range on property values. It acknowledged that it was of concern to some local residents, albeit not a major issue in the global sense. Moreover, the agency gave at least some consideration to this issue, noting that it had "searched the literature and consulted with social scientists and legal experts." J.A. 752. The record reflects that the Forest Service contacted Dr. Ken Cordell of Forestry Sciences Laboratory in Georgia who wrote that he was not aware of any work "that addresses effects of shooting ranges on market value of adjacent or nearby properties." J.A. 420. He did note that he believed "[t]here ha[d] been a few studies . . . addressing generally effects of noise from operations such as airports" and that "[f]rom personal experience I would say shooting is very much an impact, especially since it tends to be heaviest on weekends." *Id.*

We conclude, based on the record before us, that the Forest Service "considered the relevant factors," "examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice

27

made." *Aracoma Coal Co.*, 556 F.3d at 192 (internal quotation marks omitted). Even though the EA omits mention of the anecdotal evidence regarding property values, we are not able to say that the agency made an arbitrary and capricious decision.

E.

Finally, Appellants argue that the Forest Service failed to estimate the cost of increased road maintenance and failed to consider potential issues created by increased traffic related to the shooting range. The Forest Service, however, took the required hard look at this issue, and its decision to authorize the project notwithstanding the maintenance costs and increased traffic was well within its discretion. The September 2013 EA indicates that the traffic on Nelson Ridge Road, which provides access to the proposed Perry Creek site, would result in 18 additional cars per day on a heavy-use day for a total of less than 50 cars per day as a result of the shooting range. This finding was based on average usage at a Forest Service shooting range in a nearby county. Based on its experience, the Forest Service concluded that Nelson Ridge Road could handle 100 cars per day and, therefore, that the road could safely absorb the additional traffic created by the shooting range.

Appellants also argue that the Forest Service relied upon insufficient and conclusory mitigation measures when determining that there will be no significant impact from increased traffic on Nelson Ridge Road. We agree with the Forest Service, however, that neither the FONSI nor the September 2013 EA relied on traffic-mitigation measures to support these conclusions. "Based on the current and projected traffic figures, the Forest Service believe[d] that that "Nelson Ridge Road [could] safely absorb

28

range-related vehicular use in addition to current use." J.A. 49. Likewise, in the Decision Notice, Ranger Stull stated that "[t]he Forest Service will implement traffic-calming measures as a safety precaution," but that "current and projected range use is consistent with [the applicable standards] for the roads that access the range site." J.A. 943.

The Forest Service noted that additional regular grading and maintenance would be required because of the increased traffic. Appellants contend that the Forest Service failed to consider the cost of increased maintenance in the September 2013 EA or that the burden of increased costs would fall on local residents. The only evidence of this is a speculative submission from a local resident. And the increased maintenance costs of 18 additional cars per day on Nelson Ridge Road, *see* J.A. 819, is not a sufficiently important factor that the Forest Service's decision to authorize the shooting range without estimating the financial costs of increased maintenance is either arbitrary or capricious.

IV.

For the foregoing reasons, we conclude that the Forest Service's consideration of the relevant facts and information before it qualified as the NEPA-required "'hard look' at the potential environmental consequences of [its] actions." *Aracoma Coal Co.*, 556 F.3d at 191. Thus, the issuance of the September 2013 EA, the final FONSI and the final Decision Notice were reasonable and not arbitrary or capricious. Accordingly, we affirm the decision of the district court.

*AFFIRMED*

29